|  | AUSA: | Shankar Ramamurthy | Telephone: (313) 226-9562 |
|--|-------|--------------------|---------------------------|
|  | Special Agent: | Andrew Crump | Telephone: (313) 670-5817 |

AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

| In the Matter of the Seizure of | ) | Case: 2:19-mc-50660 -1 |
|---|---|---|
| *(Briefly describe the property to be seized)* | ) | Judge: Murphy, Stephen J. |
| All funds on deposit in AXA Life Insurance Policy | ) Case No. | Filed: 05-03-2019 |
| Number 157213020 as further described on Attachment A | ) | IN RE:SEALED MATTER(SW)(MLW) |
|  | ) |  |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Eastern_____ District of _____Michigan_____ is subject to forfeiture to the United States of America under _____ U.S.C. §

See Below    *(describe the property)*:

18 U.S.C. § 981(a)(1)(A) and (C); 18 U.S.C. § 982(a); 21 U.S.C. § 881(a); and 28 U.S.C. § 2461 - All funds on deposit in AXA Life Insurance Policy Number 157213020 as further described on Attachment A

The application is based on these facts:
See Attached Affidavit

☐ Continued on the attached sheet.

_____
*Applicant's signature*

FBI SA Andrew Crump
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: __May 3, 2019__

_____
*Judge's signature*

City and state: __Detroit, MI__

Anthony P. Patti            U. S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANTS

I, Andrew F. Crump, Special Agent for the Federal Bureau of Investigation, being duly sworn, depose and state as follows in support of the government's application for the issuance of seizure warrants for funds in the following bank, investment, and insurance accounts, collectively referred to as the **Target Accounts**:

A. **Bank of America Account No. 4474000141, in the name of Dearborn Heights Pharmacy;**

B. **Bank of America Account No. 5407033538, in the name of NHF, Inc. DBA Dearborn Heights Pharmacy;**

C. **Bank of America Account No. 5304840944, in the names of Nabil and Mona Fakih;**

D. **Bank of America Account No. 9097191127, in the names of Nabil and Mona Fakih;**

E. **Bank of America Account No. 375012255329, in the names of Ford Real Estate, LLC;**

F. **J.P. Morgan Chase Bank Account No. 975640616, in the name of Dial Drugs, Inc.;**

G. **J.P. Morgan Chase Bank Account No. 804759942, in the names of Nabil or Mona Fakih;**

H. **J.P. Morgan Chase Bank Account No. 2968539183, in the names of Wael Khanafer and Sarah Jafar;**

I. **J.P. Morgan Chase Bank Account No. 975640830, in the name of Infinity RX, PC;**

J. **J.P. Morgan Chase Bank Account No. 966198202, in the names of**

Wael Khanafer and Sarah Jafar;

K.   J.P. Morgan Chase Bank Account No. 993627942, in the names of Nabil or Mona Fakih;

L.   Merrill Lynch Account No. 642-18494, in the name of Nabil and Mona Fakih;

M.   Merrill Lynch Account No. 642-29336, in the name of Nabil and Mona Fakih;

N.   Merrill Lynch Account No. 51X-58Y31, in the names of Nabil and Mona Fakih.

O.   AXA Life Insurance Policy No. 157213020, held By Nabil Fakih

P.   Fidelity Investments Account No. X91-704772, in the name of Nabil Fakih

Q.   Fidelity Investments Account No. X66-970688, in the name of Nabil Fakih

R.   Fidelity Investments Account No. X83-924263, in the name of Nabil Fakih

S.   Fidelity Investments Account No. X93-653593, in the name of Nabil Fakih

The funds to be seized from the **Target Accounts** constitute a portion of the proceeds of a health care fraud, wire fraud, and money laundering scheme that resulted in over $6 million in Medicare, Medicaid, and private insurance funds being fraudulently reimbursed to DEARBORN HEIGHTS PHARMACY ("DHP") between January 2011 and June 2016, and fraudulently reimbursed to DIAL PHARMACY ("DIAL") between January 2012 and January 2018.

2

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), duly appointed according to law and acting as such, and have been employed as such since October 2014.  As a Special Agent in the FBI, I have received general law enforcement training at the FBI Academy, as well as specialized training on the subjects of health care fraud, money laundering and telephone analysis from the FBI, and I have been personally involved in investigations concerning health care fraud, prescription drug diversion and methods used to finance and conceal the profits of those operations.  I have interviewed numerous self-proclaimed drug users, medical doctors, and owners and employees of medical clinics.  I have investigated and conducted surveillance on numerous doctors, pharmacies and prescription drug dealers.  I have consulted with agents and officers of numerous federal, state, and local agencies in gaining an understanding of current trends in the diversion of prescription drugs and health care fraud.  I am currently assigned to the Detroit Division of the FBI and my duties include investigating health care fraud and prescription drug diversion.

2.      Based on my training, experience, and participation in financial investigations involving the concealment of funds and assets in order to prevent detection by law enforcement agencies, I have observed that:

a.  Individuals involved in illegal activities often generate large amounts cash and money through those activities. These individuals often use the cash and money to facilitate the operation of their illegal activities by disguising fund transfers to close associates as legitimate income payments, and purchasing legitimate personal items, such as housing, cars, jewelry, and clothing.

b.  Individuals attempting to conceal their income or illegal activities frequently transfer assets to friends, relatives, or close associates to avoid detection of those assets by the IRS and other government agencies. Even though such assets are in the names of others, the true owners of the assets typically continue to exercise dominion and control over these assets.

c.  Individuals involved in illegal activities often use banks to conduct financial transactions involving proceeds of their criminal activities. Such individuals often establish multiple businesses and transfer funds between accounts to disguise the nature, source, ownership, control, and location of criminal proceeds, and to make their wealth appear to have been obtained legitimately. Such individuals also often commingle their criminal proceeds with legitimate funds in bank accounts or other financial accounts in order to conceal the illegal source of their criminal proceeds.

I refer to these methods that criminals often use to conceal the nature, source, ownership, control, and location of their criminal proceeds as "money laundering."

3.      As a Special Agent with the FBI, I am responsible for investigating violations of United States federal law, including, but not limited to Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1343 (Wire Fraud), and Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud). I have participated in the execution of search warrants for documents and other evidence as well as seizure warrants in

cases involving violations of these offenses.

4.     I have knowledge of the facts set forth in this affidavit as a result of my participation in the investigation and information provided to me by other law enforcement agents.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this investigation.

## PURPOSE OF THE AFFIDAVIT

5.     This affidavit is submitted in support of an Application seeking authorization to seize and/or freeze funds on deposit contained in the bank, investment, or insurance accounts listed in the **Target Accounts**.

6.     As discussed herein, the statements in this affidavit are based upon information I learned during the investigation, including information provided to me by other law enforcement agents and government contractors and upon my experience and background as an FBI Special Agent.  Since this affidavit is being submitted for the limited purpose of supporting seizure warrants, I have not included every fact known to me concerning this investigation. This affidavit is intended to show merely that sufficient probable cause exists for the requested seizure warrants and does not set forth all of my knowledge about this investigation.

7.     Based upon my training and experience, and the information set forth

in this affidavit, there is probable cause to believe that the funds in the target accounts constitute: (a) the proceeds of illegal activity, and/or property traceable to proceeds of illegal activity, specifically wire fraud in violation of 18 U.S.C. 1343, health care fraud in violation of 18 U.S.C. 1347, and conspiracy to commit health care fraud in violation of 18 U.S.C. 1349; (b) the gross proceeds of illegal activity, and/or property traceable to gross proceeds of illegal activity, specifically health care fraud in violation of 18 U.S.C. 1343 and 18 U.S.C. 1347; and/or, (c) property involved in, or traceable to property involved in money laundering, in violation of 18 U.S.C. 1956 and 1957. As such, these funds are subject to seizure and civil and/or criminal forfeiture pursuant to 18 U.S.C. §§ 981 (a)(1)(A) and (C), 18 U.S.C. §§ 982(a)(1) and (7), 18 U.S.C. § 1956(c)(7)(F), and 28 U.S.C. § 2461(c).

## VIOLATION STATUTES

8.     Title 18, United States Code, Section 1347, prohibits health care fraud: Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined

under this title or imprisoned not more than 10 years, or both.

9.     Title 18, United States Code, Section 1343, prohibits wire fraud:

Whoever, having devised or intending to devise any scheme or artifice to defraud,

or for obtaining money or property by means of false or fraudulent pretenses,

representations, or promises, transmits or causes to be transmitted by means of

wire, radio, or television communication in interstate or foreign commerce, any

writings, signs, signals, pictures, or sounds for the purpose of executing such

scheme or artifice, shall be fined under this title or imprisoned not more than 20

years, or both.

10.     Title 18, United States Code, Section 1349, provides that any person

who attempts or conspires to commit health care fraud or wire fraud shall be

subject to the same penalties as those proscribed in 18 U.S.C. § 1347 and 18

U.S.C. § 1343, respectively.

11.     Title 18, United States Code, Section 24(b), defines a "health care

benefit program" as, among other things, "any public or private plan . . . affecting

commerce, under which any medical benefit, item, or service is provided to any

individual, and includes any individual or entity who is providing a medical

benefit, item, or service, for which payment may be made under the plan."

12.     Title 18 of the United States Code, Section 1956 prohibits engaging in

monetary transactions in property derived from specified unlawful activity:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

(A) with the intent to promote the carrying on of a specified unlawful activity;

(B) knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or control of the proceeds of specified unlawful activity.

13.     Title 18, United States Code, Section 1957 prohibits knowingly engaging in or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

14.     Title 18, United States Code, Section 1956, sets forth a list of "specified unlawful activities," which includes, "any act or activity constituting an offense involving a Federal health care offense." *See* 18 U.S.C. § 1956(c)(7)(F).

## APPLICABLE FORFEITURE STATUTES

15.     18 U.S.C. § 981 *Civil Forfeiture*

(a) (1) The following property is subject to forfeiture to the United States:

(A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

\*          \*          \*          \*

(C) Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 656, 657, 842, 844, 1005, 1006, 1007, 1014, 1028, 1029, 1030, 1032, or 1344 of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

(b)(1) Except as provided in section 985, any property subject to forfeiture to the United States under subsection (a) may be seized by the Attorney General and, in the case of property involved in a violation investigated by the Secretary of the Treasury or the United States Postal Service, the property may also be seized by the Secretary of the Treasury or the Postal Service, respectively.

(b)(2) Seizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure . . . .

(b)(3) Notwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against the property may be filed under section 1355(b) of title 28, and may be executed in any district in which the property is found.

16.    18 U.S.C. § 982 *Criminal Forfeiture*

(a)(7) The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly

or indirectly, from gross proceeds traceable to the commission of the offense.

17.   18 U.S.C. § 984  *Civil Forfeiture of Fungible Property*

(a)(1) In any forfeiture action in rem in which the subject property is . . funds deposited in an account in a financial institution . . .

(A)                    it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for forfeiture; and

(B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

18.   "If a person is charged in a criminal case with a violation of an Act of Congress for which civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure.  If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case." 28 U.S.C. § 2461(c).

## THE MEDICARE AND MEDICAID PROGRAMS

19.   The Medicare Program ("Medicare") is a federally-funded health care program providing benefits to persons who are sixty-five years of age or older or disabled.  Medicare is administered by CMS, a federal agency within the Department of Health and Human Services ("HHS").  Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

20.     Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

21.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).  This investigation involves Medicare Part D, prescription drug benefits.

22.     A pharmacy can participate in Medicare Part D by entering into a retail network agreement directly with a plan or with one or more Pharmacy Benefit Managers ("PBMs").  A PBM acts on behalf of one or more Medicare drug plans.  Through a plan's PBM, a pharmacy can join the plan's network.  When a Medicare Part D beneficiary presents a prescription to a pharmacy, the pharmacy submits a claim either directly to the plan or to a PBM that represents the beneficiary's Medicare drug plan.  The plan or PBM determines whether the pharmacy is entitled to payment for each claim and periodically pays the pharmacy for outstanding claims.  The drug plan's sponsor reimburses the PBM for its payments to the pharmacy.  PBMs sometimes contract with Pharmacy Services Administrative Organizations ("PSAOs") to administer some of its services, such as payments.

23.     CVS Caremark, OptumRx, and Express Scripts are three of several PBMs.  CVS Caremark processes and adjudicates claims electronically in Arizona.  OptumRx and Express Scripts process and adjudicate claims electronically outside the state of Michigan.

24.     Medicare, through CMS, compensates the Medicare drug plan sponsors and pays the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans.  Such payments are called capitation fees.  The capitation fee is adjusted periodically based on various factors, including the beneficiary's medical conditions.  In addition, in some cases where a sponsor's expenses for a beneficiary's prescription drugs exceed that beneficiary's capitation fee, Medicare reimburses the sponsor for a portion of those additional expenses.

25.     By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement.  To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

26.     Medicare providers are required to maintain all records that disclose the extent of services provided and significant business transactions for a period of at least six years.

27.     Qlarant is the Medicare Part C and Part D program integrity contractor for CMS under the National Benefit Integrity (NBI) Medicare Drug Integrity Contract (MEDIC).  The purpose of Qlarant is to detect, prevent, and investigate

allegations of fraud, waste, and abuse in the Part C (Medicare Advantage Organizations) and Part D (Prescription Drug Coverage) programs on a national level.

28.     The Michigan Medicaid Program ("Medicaid") is a federal and state funded health care program providing benefits to individuals and families who meet specified financial and other eligibility requirements, and certain other individuals who lack adequate resources to pay for medical care.   CMS is responsible for overseeing the Medicaid program in participating states, including Michigan. Individuals who receive benefits under the Medicaid program are also referred to as "beneficiaries."

29.     Medicaid covers the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled.   Among the specific medical services and products provided by Medicaid are reimbursements to pharmacies for the provision of prescription drugs. Generally, Medicaid covers these costs if, among other requirements, they are medically necessary and ordered by a physician.

## THE INVESTIGATION

### Dearborn Heights Pharmacy

30.     Dearborn Heights Pharmacy ("DHP") is a registered business entity with the Michigan Department of Licensing and Regulatory Affairs ("LARA"),

Corporations, Securities, and Commercial Licensing Bureau. It was formed under its legal name as NHF Inc. (NHF) on November 1, 2001, by Nabil Fakih ("Fakih"). In 2004, 2009, and 2014, certificates of assumed name and/or renewal of assumed name were filed with LARA representing that NHF Inc., would transact business as DHP. In 2012 and 2017, certificates of assumed name and/or renewal of assumed name were filed with LARA representing that NHF Inc., would transact business as DHP Pharmacy (DHPP). NHF currently operates under the assumed name DHP until expiration on December 31, 2019, and DHPP until expiration on December 31, 2022. The annual statements filed by DHP with LARA indicate that the resident agent name and registered office are Nabil Fakih, 25524 Ford Road, Dearborn Heights, MI 48127. LARA records also show that Nabil Fakih is a licensed pharmacist in the state of Michigan.

31. During the course of my investigation, I requested records from PBMs. According to information I obtained through the provider certification from Express Scripts, a PBM that services DHP, the practice address for DHP is 25524 Ford Road, Dearborn Heights, MI 48127. According to the provider certification, Fakih was the pharmacist-in-charge and 100% owner of DHP up until March 29, 2017. Fakih is presently 100% owner of DHP. Fakih's signature appears on the provider certification.

## Dial Drugs

32.    Dial Drugs Inc. ("Dial") is a registered business entity with LARA.  It was formed under its legal name as Dial Drugs Inc. ("Dial") on July 13, 2007, by Fakih.  In 2018, a certificate of assumed name was filed with LARA representing that Dial, would transact business as MEDLINK LTC.  The annual statements filed by Dial with LARA indicate that the resident agent name and registered office are Nabil Fakih, 8226 Merriman, Westland, Michigan 48185.

33.    During the course of my investigation, I requested records from PBMs.  According to information I obtained through the provider certification from Express Scripts, a PBM that services Dial, the practice address for Dial is 8226 Merriman, Westland, Michigan 48185.  According to the provider certification of December 2016, Wael Khanafer ("Khanafer") is the pharmacist-in-charge and 50% owner of Dial.  Khanafer's signature appears on the provider certification.  Fakih is also listed as having a 50% ownership interest in Dial.  LARA records also show that Wael Khanafer is a licensed pharmacist in the state of Michigan.

## FRAUD SCHEME

34.    Fakih and Khanafer, while owning and operating DHP and Dial, fraudulently billed Medicare and Medicaid for expensive medication that was not dispensed to beneficiaries. DHP and Dial did not have sufficient drug inventory to dispense several expensive medications billed to Medicare and Medicaid.

15

35.    Fakih and Khanafer submitted false and fraudulent claims, through interstate wires from Michigan, to Medicare and Medicaid, as well as Blue Cross Blue Shield of Michigan. The claims were processed and adjudicated electronically by CVS Caremark, OptumRx, and Express Scripts, among other PBMs, outside the state of Michigan.

## Qlarant Invoice Reconciliation DHP

36.    In 2016, the Michigan Department of Health and Human Services, Office of Inspector General ("MDHHS-OIG") conducted an invoice review of DHP for the period January 1, 2011, through June 30, 2016.  MDHHS-OIG's invoice review compared DHP's drug purchases to its Medicaid billing for this period. MDHHS-OIG provided me with DHP's drug purchase records utilized in its invoice review of DHP for the above-stated period.   During the MDHHS-OIG invoice review, the MDHHS-OIG verified with Fakih the pharmaceutical wholesalers used by DHP.

37.    The records provided by MDHHS-OIG contained drug sale or purchase records from Amerisource Bergen, Anda, Auburn, Capital Wholesale Drug Company, Cardinal, Global Pharmacy Wholesale, Harvard Drug Group, Match Rx, Top Rx, Trxade, and Prescription Supply Inc. I also obtained additional drug sale or purchase records from Auburn for 2011 and 2012.

38.    I furnished all of the wholesaler records I received to Qlarant and

requested an invoice review for the period of January 1, 2011, through June 30, 2016.

Qlarant compared invoices for DHP's drug purchases to both Medicare and

Medicaid claims data for this period.

39.     On February 21, 2019, Qlarant finalized its invoice review of DHP and

concluded the following:

**Date Range of Invoice Review:** 1/1/2011 – 6/30/2016

**Number of Drugs Reviewed:** 149

**Total number of drugs short to Medicare:** 94

**Total number of drugs short to Medicaid:** 15

**Approximate Dollar Loss according to Medicare:** $3,396,714.86

**Approximate Dollar Loss according to Medicaid:** $269,056.90

**Approximate Dollar Loss according to Medicare and Medicaid Combined:** $3,665,771.76.

40.     Qlarant provided the following summary of DHP's top 10 drug

shortages by approximate dollar loss to Medicare and Medicaid combined:

| Drug Name | Approx. Dollar Loss |
|---|---|
| SEROQUEL TAB 300 MG | $296,387.73 |
| ZYPREXA TAB 20 MG | $229,291.76 |
| SEROQUEL XR TAB 400 MG | $210,035.27 |
| SPIRIVA CAP HANDIHLR | $205,234.35 |
| ADVAIR DISKU AER 250/50 | $151,144.00 |
| HUMIRA KIT 40 MG/0.8 | $135,150.85 |
| ZYPREXA TAB 15 MG | $133,745.24 |
| SEROQUEL TAB 400 MG | $126,521.03 |
| SEROQUEL XR TAB 300 MG | $117,763.30 |

| Drug Name | Approx. Dollar Loss |
|---|---|
| ABILIFY TAB 30 MG | $109,115.01 |

41.    In sum, Qlarant concluded that DHP's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare for 94 of the 149 drugs selected for the analysis.  DHP's inventory was not sufficient to support claim submissions to Medicaid for 15 of the same 149 drugs selected for analysis.  Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid DHP approximately $3,665,771.76 for medications that DHP did not have sufficient inventory to dispense.  The shortage drugs that caused the highest dollar loss were Seroquel, Zyprexa, and Spiriva.

## Blue Cross Blue Shield Shortage

42.    Based on the shortage to Medicare and Medicaid, Blue Cross Blue Shield performed an analysis to determine how the shortage affected overpayments by Blue Cross Blue Shield to DHP.

43.    On February 6, 2019, Blue Cross Blue Shield provided a financial impact letter where a determination was made that Blue Cross Blue Shield paid a total of $1,432,810.70 in claims submitted by DHP that indicated a shortage of pharmaceutical drugs being supplied.

## Qlarant Invoice Reconciliation Dial

44.    I requested drug purchase records and received responses from the pharmaceutical wholesalers used by Dial. I requested all drug sale or purchase

18

records from Amerisource Bergen, Anda, ASD Healthcare, Auburn, Cardinal, Global Pharma, Harvard Drugs, Match Rx, and Quest. I furnished all of the wholesaler records I received to Qlarant and requested that an invoice review be conducted for the period January 1, 2012 through July 18, 2018.  Qlarant compared invoices for Dial's drug purchases to Medicare and Medicaid claims data for this period.

45.    On January 17, 2019, Qlarant finalized their invoice review of Dial and provided the following summary:

**Wholesalers with Supportive Invoices:** Amerisource Bergen, Anda, ASD Healthcare, Auburn, Cardinal, Global Pharma, Harvard Drugs, Match Rx, and Quest.

**Date Range of Invoice Review:** 1/1/2012 – 7/18/2018

**Number of Drugs Reviewed:** 165

**Total number of drugs short to Medicare:** 72

**Total number of drugs short to Medicaid:** 3

**Approximate Dollar Loss according to Medicare:** $553,506.16

**Approximate Dollar Loss according to Medicaid:** $16,164.29[1]

**Approximate Dollar Loss according to Medicare and Medicaid Combined:** $569,670.45.

---

[1] The price per unit under Medicaid may differ from that of the price per unit under Medicare Part D. However this review utilizes the price per unit calculated for the drugs of interest by the Medicare Part D program to calculate an approximate dollar loss to Medicaid.

46.   Qlarant provided the following summary of Dial's top 10 drug shortages by approximate dollar loss to Medicare and Medicaid combined:

| Drug Name | Approx. Dollar Loss |
|---|---|
| ONFI SUS 2.5 MG/ML | $138,097.61 |
| ABILIFY TAB 20 MG | $72,040.42 |
| ABILIFY TAB 30 MG | $45,854.59 |
| SEROQUEL XR TAB 400 MG | $43,934.20 |
| ABILIFY TAB 10 MG | $39,984.83 |
| SEROQUEL XR TAB 300 MG | $34,426.61 |
| SEROQUEL XR TAB 200 MG | $15,225.83 |
| FAZACLO TAB 200 ODT | $14,957.06 |
| ABILIFY TAB 15 MG | $13,541.63 |
| ABILIFY TAB 2 MG | $10,946.75 |

47.   In sum, Qlarant concluded that Dial's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare for 72 of the 165 drugs selected for the analysis. Dial's inventory was not sufficient to support claim submissions to Medicaid for 3 of the same 165 drugs selected for analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Dial approximately $569,670.45 for medications that Dial did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Onfi Sus, Abilify, and Seroquel.

### Blue Cross Blue Shield Shortage

48.   Based on the shortage to Medicare and Medicaid, Blue Cross Blue Shield performed an analysis to determine how the shortage affected overpayments by Blue Cross Blue Shield to Dial.

49. On February 13, 2019, Blue Cross Blue Shield provided a financial impact letter where a determination was made that Blue Cross Blue Shield paid a total of $558,079.29 in claims submitted by Dial that indicated a shortage of pharmaceutical drugs being supplied.

### Total Fraud Amount

50. In summary, the combined shortage loss to Medicare, Medicaid, and Blue Cross Blue Shield for the selected reviewed drugs (considering all pharmacies named in this affidavit) is $6,226,332.20.

### Billing for Deceased Beneficiaries DHP

51. I conducted a review of the Medicare Part D claims data for DHP, which revealed that DHP billed for medication purportedly dispensed to beneficiaries after they were deceased. Between January 2011 and March 2018, DHP submitted 115 claims for medications purportedly dispensed to beneficiaries after their dates of death. Medicare paid DHP approximately $13,933.17 based on these claims.

52. I conducted a review of the Medicaid claims data for DHP, which revealed that DHP billed for medication purportedly dispensed to beneficiaries after they were deceased. Between September 2010 and July 2015, DHP submitted 27 claims for medications purportedly dispensed to beneficiaries after their dates of death. Medicaid paid DHP approximately $1,787.15 based on these claims.

## Billing for Deceased Beneficiaries Dial

53.    I conducted a review of the Medicare Part D claims data for Dial, which revealed that Dial billed for medication purportedly dispensed to beneficiaries after they were deceased.  Between July 2013 and February 2017, Dial submitted 22 claims for medications purportedly dispensed to beneficiaries after their dates of death.  Medicare paid Dial approximately $919.55 based on these claims.

54.    I conducted a review of the Medicaid claims data for Dial, which revealed that Dial billed for medication purportedly dispensed to beneficiaries after they were deceased.  Between January 2010 and October 2017, Dial submitted 10 claims for medications purportedly dispensed to beneficiaries after their dates of death.  Medicaid paid Dial approximately $51.58 based on these claims.

## PROBABLE CAUSE FOR SEIZURE OF
## FUNDS FROM TARGET ACCOUNTS

55.    As part of this investigation, records were obtained and reviewed for financial involvement relative to allegations of violations of federal law by Nabil Fakih, Wael Khanafer, and others known and unknown.  Having reviewed multiple accounts, it was determined that the accounts listed below contained proceeds of illegal activity and/or were involved in, or traceable to funds involved in, money laundering.

56.    The following chart list the accounts identified as receiving fraudulently obtained funds (either directly or indirectly).  The charts contain a

"Tier" designation column indicating the manner in which the account received Medicare funds or illegal drug proceeds.  Accounts with a "Tier One" designation received cash deposits of illegal drug proceeds or direct deposits of Medicare funds as a result of fraudulently submitted claims by the operators of the respective facilities.  Accounts with a "Tier Two" designation received illegally obtained monies by way of transfer of funds, wire, deposits of checks, interbank transfers, or by withdrawal and deposits from "Tier One" accounts.  Ensuing tiers were similarly designated.  Additionally, while some accounts could be categorized into multiple tiers, they have been categorized into the lowest tier possible to highlight the most direct flow of illegal funds into the accounts.

| ACCOUNTS REQUESTED FOR SEIZURE | | | |
|---|---|---|---|
| **Financial Institution** | **Account #** | **Account Name** | **Tier** |
| Bank of America | 4474000141 | Dearborn Heights Pharmacy | 1 |
| JP Morgan Chase | 975640616 | Dial Drugs, Inc. | 1 |
| JP Morgan Chase | 804759942 | Nabil or Mona Fakih | 2 |
| JP Morgan Chase | 975640830 | Infinity RX, PC | 2 |
| JP Morgan Chase | 2968539183 | Wael and Sarah Khanafer | 2 |
| Bank of America | 9097191127 | Nabil or Mona Fakih | 2 |
| Bank of America | 5304840944 | Nabil or Mona Fakih | 2 |
| Bank of America | 5407033538 | NFH, Inc, dba Dearborn Heights Pharmacy | 2 |
| JP Morgan Chase | 966198202 | Wael and Sarah Khanafer | 2 |
| Fidelity Investments | X91-704772 | Nabil Fakih | 2 |
| JP Morgan Chase | 993627942 | Nabil Fakih | 3 |
| AXA Life Insurance | 157213020 | Nabil Fakih | 3 |
| Fidelity Investments | X66-970688 | Nabil Fakih | 3 |
| Fidelity Investments | X83-924263 | Nabil Fakih | 3 |
| Fidelity Investments | X93-653593 | Nabil Fakih | 3 |
| Merrill Lynch | 51X-58Y31 | Nabil Fakih | 3 |

| Merrill Lynch | 642-18494 | Nabil and Mona Fakih | 3 |
| Merrill Lynch | 642-29336 | Nabil and Mona Fakih | 3 |
| Bank of America | 375012255329 | Ford Real Estate, LLC | 4 |

### *Tier One Accounts*

### Bank of America Account No. 4474000141,
### Held by Dearborn Heights Pharmacy

57.    Records from Bank of America (BOA) show that Account No. 4474000141 is a business checking account held by Dearborn Heights Pharmacy. Nabil Fakih is its only signatory.  As of February 28, 2019, the balance in the account was $71,549.03.

58.    Records from BOA show that BOA Account No. 4474000141 is an electronic funds repository account for receipt of payment for services from Medicare, Medicaid, BCBS, and, as such, it is a Tier One account.  Based on DHP invoice activity for the time period January 2011 through June 2016, BOA Account No. 4474000141 received $33,174,919.00 from insurers, including PBMs. Medicare and Medicaid reimbursed DHP approximately $23.4 million during this time period.

59.    Investigators did not identify any other bank accounts into which Medicare, Medicaid, or BCBS, deposited reimbursements.

60.    Nabil Fakih, as owner of Dearborn Heights Pharmacy, certified to PBMs, including Express Scripts, that the majority of reimbursements were for claims submitted for reimbursements from Medicare and Medicaid. In October

2014, Fakih certified that 85% of claims for DHP were submitted for reimbursements from Medicare and/or Medicaid. In March 2017, Fakih certified that 96% of claims for DHP were submitted for reimbursements from Medicare and/or Medicaid.

61.    Between January 2011 and June 2016, DHP was reimbursed at least $3,665,771.76 from Medicare and Medicaid for medications that DHP did not have sufficient inventory to dispense.

62.    DHP was also reimbursed at least $1,432,810.70 from Blue Cross Blue Shield (BCBS) for medications that DHP did not have sufficient inventory to dispense.

63.    Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that DHP fraudulently obtained at least $5,098,582.46 ($3,665,771.76 + $1,432,810.70) from Medicare, Medicaid, and BCBS, and the funds were deposited into BOA Account No. 4474000141. Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

64.    There is probable cause to believe that that at least $5,098,582.46 was received into this account, to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18

U.S.C. § 1956(a)(1)(B)(i), by commingling the criminal proceeds with ostensibly non-criminal proceeds.

**J.P. Morgan Chase Bank Account No. 975640616,**
**Held by Dial Drugs, Inc.**

65.    Records from J.P. Morgan Chase Bank (JPMC) show that Account No. 975640616 is a checking account held by Dial Drugs, Inc.  It was opened on May 16, 2011, and has Nabil Fakih and Wael Khanafer as its signatories.  As of February 28, 2019, the balance in the account was approximately $53,554.

66.    A review of subpoenaed documents reveals J.P. Morgan Chase (JPMC) Bank Account No. 975640616, held by Dial Drugs, Inc., is an electronic funds repository account for receipt of payment for services from Medicare, Medicaid, BCBS, and, as such, it is a Tier One account.  Based on DHP invoice activity for the time period January 2012 through June 2016, JPMC Account No. 975640616 received $12,777,705.00 from insurers, including PBMs on behalf of Medicare and Medicaid.

67.    Investigators did not identify any other bank accounts into which Medicare, Medicaid, or BCBS, deposited reimbursements.

68.    Nabil Fakih and Wael Khanafer, as owners of Dial Drugs, Inc., certified to PBMs, including Express Scripts, that a significant amount of reimbursements were for claims submitted for reimbursements from Medicare and Medicaid. In September 2014, Fakih certified that 99% of claims for Dial were

submitted for reimbursements from Medicare and/or Medicaid. In December 2016, Khanafer certified that at least 49% of claims for Dial were submitted for reimbursements from Medicare and/or Medicaid.

69.     Between January 2011 and June 2016, Dial was reimbursed at least $569,670.45 from Medicare and Medicaid for medications that Dial did not have sufficient inventory to dispense.

70.     Dial was also reimbursed at least $558,079.29 from Blue Cross Blue Shield (BCBS) for medications that Dial did not have sufficient inventory to dispense.

71.     Given the facts obtained during this investigation and set forth herein, there is probable cause to believe that Dial fraudulently obtained at least $1,127,749.74 ($569,670.45 + $558,079.29) from Medicare, Medicaid, and BCBS, was deposited into JPMC Account No. 975640616.  Thus, these funds constitute proceeds of health care fraud, wire fraud, and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and any legitimate funds were commingled with illegitimate funds.

72.     There is probable cause to believe that that at least $1,127,749.74 was received into this account, to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18

U.S.C. § 1956(a)(1)(B)(i), by commingling the criminal proceeds with ostensibly non-criminal proceeds.

## *Tier Two Accounts*

### J.P. Morgan Chase Bank Account No. 804759942, Held by Nabil or Mona Fakih

73.     Records from JPMC show that Account No. 804759942 is a checking account held by Nabil or Mona Fakih. Mona Fakih is believed to be the spouse of Nabil Fakih. The account was opened February 19, 2009, and has Nabil Fakih and Mona Fakih as its signatories. As of January 22, 2019, the balance in the account was $11,885.

74.     Records from JPMC also show that from July 16, 2013, to June 1, 2018, in a series of 81 transactions, $916,350.00 was moved from Tier One JPMC Account No. 97540616 into JPMC Account No. 804759942. Because of these transfers, JPMC Account No. 804759942 is a Tier Two account.

75.     Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that at least $916,350.00 deposited into this account from Tier One JPMC Account No. 97540616 were PBM reimbursements obtained through health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and that any legitimate funds were commingled with illegitimate funds.

76.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

77.   There is also probable cause to believe that 17 transfers into this account from Tier One JPMC Account No. 97540616 between July 16, 2013, to June 1, 2018, constituted a violation of 18 U.S.C. § 1957 in that: (1) the deposits were monetary transactions involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States.

### J.P. Morgan Chase Bank Account No. 975640830, Held by Infinity RX, PC

78.   Records from JPMC Account No. 975640830 show that it is a checking account held by Infinity RX, PC. The account was opened on May 17, 2011, and has Wael Khanafer and Sarah Jaafar as its signatories.  As of February

28, 2019, the balance in the account was $5,677.00.

79.    Records from JPMC also show that from January 1, 2012, to June 21,
2018, in a series of 221 transactions, $207,466.00 was moved from Tier One JPMC
Account No. 97540616 to JPMC Account No. 975640830.  Because of these
transfers, JPMC Account No. 975640830 is a Tier Two account.

80.    Given the facts obtained during the investigation of this matter, and
set forth herein, there is probable cause to believe that at least $207,466.00
deposited into this account from Tier One JPMC Account No. 97540616 were
PBM reimbursements obtained through health care fraud and a conspiracy to
commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349,
respectively, and that any legitimate funds were commingled with illegitimate
funds.

81.    In addition to being proceeds of the health care fraud scheme, there
is probable cause to believe that all funds on deposit in this account were
involved in concealing or disguising the nature, source, location, ownership,
and control of the criminal proceeds in violation of 18 U.S.C. §
1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18
U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

### J.P. Morgan Chase Bank Account No. 2968539183, Held by Wael Khanafer and Sarah Jaafar

82.    Records show that JPMC Account No. 2968539183 is a checking

30

account held by Wael Khanafer and Sarah Jaafar. Sarah Jaafar is believed to be the spouse of Wael Khanafer. The account was opened on July 13, 2013, and has Wael Khanafer and Sarah Jaafar as its signatories. As of February 28, 2019, the balance in the account was $298,466.00.

83. Records from JPMC also show that from November 10, 2014, to June 1, 2018, in a series of 42 transactions, $580,920.00 was moved from Tier One JPMC Account No. 97540616 to JPMC Account No. 2968539183. Because of these transfers, JPMC Account No. 2968539183 is a Tier Two account.

84. Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that at least $580,920.00 deposited into this account from Tier One JPMC Account No. 97540616 were PBM reimbursements obtained through health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and that any legitimate funds were commingled with illegitimate funds.

85. In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18

31

U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

86.    There is also probable cause to believe that 11 transfers into this account from Tier One JPMC Account No. 97540616 between November 10, 2014, and January 8, 2018, constituted a violation of 18 U.S.C. § 1957 in that: (1) the deposits were monetary transactions involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States.

### Bank of America Account No. 9097191127, Held by Nabil and Mona Fakih

87.    Records from BOA show that BOA Account No. 9097191127 is a checking account held by Nabil or Mona Fakih.  The account was opened on October 17, 2008.  As of March 14, 2019, the balance in the account was $136,700.00.

88.    Records from BOA also show that from July 31, 2013, to April 25, 2018, in a series of seven transactions, $78,600.00 was moved from Tier One BOA Account No. 4474000141 into BOA Account No. 9097191127.  Because of these transfers, JPMC Account No. 9097191127 is a Tier Two account.

89. Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that at least $78,600.00 deposited into this account from Tier One BOA Account No. 4474000141 were PBM reimbursements obtained through health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and that any legitimate funds were commingled with illegitimate funds.

90. In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

91. There is also probable cause to believe that three transfers into this account from Tier One BOA Account No. 4474000141 between June 14, 2017, and January 30, 2018, constituted a violation of 18 U.S.C. § 1957 in that: (1) the deposits were monetary transactions involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-

7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States.

**Bank of America Account No. 5304840944,**
**Held by Nabil and Mona Fakih**

92.     Records from BOA show that account no. 5304840944 is a checking account held by Nabil or Mona Fakih.  The account was opened on October 17, 2008, and has Nabil Fakih and Mona Fakih as its signatories.  As of March 14, 2019, the balance in the account was $21,965.00.

93.     Records from BOA also show that from August 2, 2011, to April 2, 2018, in a series of 61 transactions, $622,350.00 was moved from Tier One BOA Account No. 4474000141 into BOA Account No. 5304840944.  Because of these transfers, BOA Account No. 5304840944 is a Tier Two account.

94.     Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that at least $622,350.00 deposited into this account from Tier One BOA Account No. 4474000141 were PBM reimbursements obtained through health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and that any legitimate funds were commingled with illegitimate funds.

95.     In addition to being proceeds of the health care fraud scheme, there

is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

96.     There is also probable cause to believe that 14 transfers into this account from Tier One BOA Account No. 4474000141 between August 2, 2011, and April 2, 2018, constituted a violation of 18 U.S.C. § 1957 in that: (1) the deposits were monetary transactions involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States.

### Bank of America Account No. 5407033538, Held by NHF, Inc., dba Dearborn Heights Pharmacy

97.     Records from Bank of America show that Account No. 5407033538 is a checking account held by Nabil Fakih.  A March 12, 2015, signature card shows Nabil Fakih as its signatory.  As of February 28, 2019, the balance in the account was $15,505.

98.     Records from BOA also show that from March 28, 2011, to May 1, 2018, in a series of 292 transactions, $4,275,301.32 was moved from Tier One BOA Account No. 4474000141 into BOA Account No. 5407033538.  Because of these transfers, BOA Account No. 5407033538 is a Tier Two account.

99.     Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that at least $4,275,301.32 deposited into this account from Tier One BOA Account No. 4474000141 were PBM reimbursements obtained through health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and that any legitimate funds were commingled with illegitimate funds.

100.     In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

101.     There is also probable cause to believe that 125 transfers into this account from Tier One BOA Account No. 4474000141 between August 23, 2013, and May 1, 2018, constituted a violation of 18 U.S.C. § 1957 in that: (1) the

deposits were monetary transactions involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States.

### J.P. Morgan Chase Bank Account No. 966198202, Held by Wael Khanafer and Sarah Jaafar

102.   Records from JPMC show that Account No. 966198202 is a checking account held by Wael Khanafer and Sarah Jaafar.  The account was opened on May 16, 2011, and has Wael Khanafer and Sarah Jaafar as its signatories.  As of February 28, 2019, the balance in the account was $33.

103.   Records from JPMC also show that from March 21, 2012, to February 25, 2015, in a series of eight transactions, $40,563.77 was moved from Tier One JPMC Account No. 97540616 into JPMC Account No. 966198202.  Because of these transfers, JPMC Account No. 966198202 is a Tier Two account.

104.   Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that at least $40,563.77 deposited into this account from Tier One JPMC Account No. 97540616 were PBM reimbursements obtained through health care fraud and a conspiracy to

commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and that any legitimate funds were commingled with illegitimate funds.

105.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

106.   There is also probable cause to believe that one transfer in the amount of $15,000.00 into this account from Tier One JPMC Account No. 97540616 on April 15, 2014, constituted a violation of 18 U.S.C. § 1957 in that: (1) the deposit was a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transaction occurred in the United States.

**Fidelity Investment Account No. X91-704772,
Held by Nabil Fakih**

107.   Records from Fidelity Investments reflect that account no. X91-704772 is an investment account held by Nabil Fakih that was opened on February 12, 2019.  The balance in the account as of February 28, 2019, was $10,968.00.

108.   Records also show on February 14, 2019, a transfer of $3,850.00 was made from Tier One BOA account no. 4744000141 into Fidelity account no. X91-704772, rendering Fidelity account no. X91-704772 a Tier Two account. Additionally, on February 28, 2019, a transfer of $1,250.00 was made from Tier Two BOA Account No. 5304840944 into Fidelity account no. X91-704772. In sum, $5,100 was transferred in February 2019 from a Tier One and a Tier Two account into Fidelity account no. X91-704772.

109.   Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that at least $3,850.00 deposited into this account from Tier One BOA Account No. 4474000141 and $1,250.00 from Tier Two BOA Account No. 5304840944, were PBM reimbursements obtained through health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and that any legitimate funds were commingled with illegitimate funds.

110.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were

involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

***Tier Three Accounts***

### J.P. Morgan Chase Bank Account No. 993627942, Held by Mona or Nabil Fakih

111.   Records from JPMC show that Account No. 993627942 is a checking account held by Mona or Nabil Fakih. The account was opened on August 10, 2011, and has Nabil Fakih and Mona Fakih as its signatories.  As of February 28, 2019, the balance in the account was $5,677.00.

112.   Records from JPMC also show that from May 15, 2017, to June 18, 2018, in a series of three transactions, $67,000.00 was moved from Tier Two JPMC Account No. 804759942 into JPMC Account No. 993627942.  Because of these transfers, JPMC Account No. 993627942 is a Tier Three account.

113.   Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that at least $67,000.00 deposited into this account from Tier Two JPMC Account No. 804759942 were PBM reimbursements obtained through health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and that any legitimate funds were commingled with illegitimate

funds.

114. In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

115. There is also probable cause to believe that two transfers in the into this account from Tier Two JPMC Account No. 804759942 between February 20, 2018, and June 18, 2018, constituted a violation of 18 U.S.C. § 1957 in that: (1) the deposits were monetary transactions involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States.

## AXA Life Insurance Policy No. 157213020,
### Held By Nabil Fakih

116. Records from AXA Advisors reflect that Nabil Fakih purchased a life insurance policy, no. 157213020, with a face amount of $3,500,000 in July of

41

2007. An AXA annual report on the policy for the period ending July 9, 2018, shows the net cash surrender value of the policy was $93,712.06.

117.   AXA annual statements show that policy no. 157213020 is a Flexible Premium Variable Life Insurance policy and that the monthly payments were $250.00 or $1,000.00 in 2011 and 2012, but that they were $200.00 after October of 2012.

118.   A review of Tier Two BOA Account No. 5304840944 shows corresponding monthly withdrawals totaling $23,000.00 to "AXA Equitable Des:Ins…. Nabil Fakih." These payments from Tier Two BOA Account No. 5304840944 render AXA Life Insurance Policy No. 157213020 a Tier Three account.

119.   Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that at least $23,000.00 deposited into AXA Life Insurance Policy No. 157213020, were PBM reimbursements obtained through health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and that any legitimate funds were commingled with illegitimate funds.

120.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership,

and control of the criminal proceeds in violation of 18 U.S.C. §

1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18

U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

### Fidelity Investment Account No. X66-970688,
### Held by Nabil Fakih

121.   Records from Fidelity Investments reflect that account no. X66-

970688 is an investment account held by Nabil Fakih that was opened on January

27, 2015.  The balance in the account as of February 28, 2019, was $21,933.00.

122.   Records also show that in a series of at least 43 transactions from

December 1, 2015, through January 18, 2018, at least $159,354.00 was moved

from Tier Two BOA Account No. 804759942 into Fidelity Account No. X66-

970688, rendering Fidelity Account No. X66-970688 a Tier Three account.

123.   In addition to being proceeds of the health care fraud scheme, there

is probable cause to believe that all funds on deposit in this account were

involved in concealing or disguising the nature, source, location, ownership,

and control of the criminal proceeds in violation of 18 U.S.C. §

1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18

U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

124.   There is probable cause to believe that that the $159,354.00 was

transferred from Tier Two BOA Account No. 804759942  to this account, to

conceal or disguise the nature, source, location, ownership, and control of the

criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

### Fidelity Investment Account No. X83-924263,
### Held by Nabil Fakih

125.   Records from Fidelity Investments reflect that Account No. X83-924263 is an investment account held by Nabil Fakih and was opened on May 14, 2018.  The balance in the account as of February 28, 2019, was $45,410.00.

126.   Those records also show that in a series of at least 21 transactions from December 26, 2018, through January 4, 2019, at least $90,009.00 was moved from Tier Two BOA Account No. 5304840944 into Fidelity Account No. X83-924263, rendering Fidelity Account No. X83-924263 a Tier Three account.  One of those transactions exceeded $10,000.00. Additionally, on January 3, 2019, $4,865.00 in funds was moved from Tier One BOA Account No. 4474000141 into Tier Three Fidelity Account No. X83-924263. In sum, from December 26, 2018, to January 4, 2019, at least $94,874.00 was moved from a Tier One and Tier Two accounts into Fidelity Account No. X83-924263.  One of those transfers exceeded $10,000.

127.   Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that at least $94,874.00 deposited into this account from Tier Two BOA Account No. 5304840944 and Tier One BOA Account No. 4474000141, were PBM reimbursements obtained through health care fraud and a conspiracy to commit health care fraud in

violation of 18 U.S.C. §§ 1347 and 1349, respectively, and that any legitimate funds were commingled with illegitimate funds.

128.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

129.   There is also probable cause to believe that one transfer into this account from Tier Two BOA Account No. 5304840944, in the amount of $18,000.00, on December 12, 2018, constituted a violation of 18 U.S.C. § 1957 in that: (1) the deposit was a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transaction occurred in the United States.

**Fidelity Investment Account No.  X93-653593,**
**Held by Nabil Fakih**

130.   Records from Fidelity Investments reflect that Account No. X93-

45

653593 is a Uniform Transfers to Minors Act (UTMA) account in the name of Maya Fakih that was opened in August 2017. The balance in the account as of February 28, 2019, was $5,080.00.

131.    Records also show that in a series of three transactions, all on August 8, 2017, $5,000.00 was transferred from Tier Two BOA Account No. 5304840944 into Fidelity account no. X93-653593, rendering Fidelity Account No. X93-653593 a Tier Three account.

132.    Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that at least $5,000.00 deposited into this account from Tier Two BOA Account No. 5304840944, were PBM reimbursements obtained through health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and that any legitimate funds were commingled with illegitimate funds.

133.    In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

**Merrill Lynch Account No. 51X-58Y31,**
**Held by Nabil Fakih**

134.   Records from Merrill Lynch reflect that Account No. 51X-58Y31 is a cash management account held by Nabil Fakih that was opened in January 2017. The balance in the account as of February 28, 2019, was $2,405.79.

135.   Records also show that in a series of at least 44 transactions from January 26, 2017, through May 14, 2018, at least $154,462.00 was moved from Tier Two BOA Account No. 5304840944 into Merrill Lynch Account No. 51X-58Y31, rendering Merrill Lynch Account No. 51X-58Y31 a Tier Three account. Of those 44 transactions, at least three exceeded $10,000.

136.   Those records also show that with two transactions from February 8, 2017, through April 20, 2017, at least $50,000 was moved from Tier Two BOA Account No. 9097191127 into Merrill Lynch account no. 51X-58Y31.  Both of those transactions exceeded $10,000.

137.   In sum, from January 26, 2017, to May 14, 2018, at least $204,462.00 was moved from two Tier Two accounts into Merrill Lynch Account No. 51X-58Y31.  Five of those transfers exceeded $10,000.

138.   Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that at least $204,462.00 deposited into this account from Tier Two BOA Account No. 5304840944 and Tier Two BOA Account No. 9097191127, were PBM reimbursements obtained

47

through health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and that any legitimate funds were commingled with illegitimate funds.

139.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

140.   There is also probable cause to believe that at least three transfers into this account from Tier Two BOA Account No. 5304840944, in the total amount of $80,000.00 between January 27, 2017, and February 10, 2018, constituted a violation of 18 U.S.C. § 1957 in that: (1) the deposits were monetary transactions involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States.

## Merrill Lynch Investment Account No. 642-18494,
## Held by Nabil and Mona Fakih

141.   Records from Merrill Lynch reflect that Account No. 642-18494 is an investment account held by Nabil and Mona Fakih that was opened on March 16, 2006. The balance in the account as of February 28, 2019, was $481,299.00.

142.   Records also show that in a series of at least 108 transactions from January 19, 2011, through November 30, 2018, at least $673,600 was moved from Tier Two BOA Account No. 5304840944 into Merrill Lynch Account No. 642-18464, rendering Merrill Lynch Account No. 642-18464 a Tier Three account.  Of those 108 transactions, at least four exceeded $10,000.00.

143.   Those records also show that with at least nine transactions from July 26, 2012, through January 16, 2018, at least $132,565.99 was moved from Tier Two BOA Account No. 9097191127 into Merrill Lynch Account No. 642-18494. Of these nine transactions, two exceeded $10,000.00.

144.   In sum, from January 19, 2011, to November 30, 2018, at least $806,165.00 was moved from two Tier Two accounts into Merrill Lynch Account No. 642-18494.

145.   Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that at least $806,165.00 deposited into this account from Tier Two BOA Account No. 5304840944 and Tier Two BOA Account No. 9097191127, were PBM reimbursements obtained

through health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and that any legitimate funds were commingled with illegitimate funds.

146.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

147.   There is also probable cause to believe that at least six transfers into this account from Tier Two BOA Account No. 5304840944, in the total amount $170,000.00 between January 19, 2011, and April 2, 2012, constituted a violation of 18 U.S.C. § 1957 in that: (1) the deposits were monetary transactions involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States.

**Merrill Lynch Investment Account No. 642-29336,**
**Held by Nabil and Mona Fakih**

148.   Records from Merrill Lynch reflect that Account No. 642-29336 is an investment account held by Nabil and Mona Fakih and was opened on August 20, 2009.  The balance in the account as of February 28, 2019, was $754,683.00.

149.   Records also show that in a series of at least 17 transactions from January 4, 2017, through July 25, 2018, at least $57,659.00 was moved from Tier Two BOA Account No. 5304840944 into Merrill Lynch Account No. 642-29336, rendering Merrill Lynch Account No. 642-29336 a Tier Three account.

150.   Those records also show that with at least ten transactions from September 25, 2013, through July 25, 2015, at least $174,499.00 was moved from Tier Two BOA Account No. 9097191127 into Merrill Lynch Account No. 642-29336. Of these ten transfers, two exceeded $10,000.

151.   In sum, from September 25, 2013, to July 25, 2018, at least $232,158.00 was moved from two Tier Two accounts into Merrill Lynch Account No. 642-29336.

152.   Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that at least $232,158.00 deposited into this account from Tier Two BOA Account No. 5304840944 and Tier Two BOA Account No. 9097191127, were PBM reimbursements obtained through health care fraud and a conspiracy to commit health care fraud in

violation of 18 U.S.C. §§ 1347 and 1349, respectively, and that any legitimate funds were commingled with illegitimate funds.

153.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

154.   There is also probable cause to believe that at least two transfers into this account from Tier Two BOA Account No. 9097191127, in the total amount of $135,000.00 between September 25, 2013, and February 9, 2018, constituted a violation of 18 U.S.C. § 1957 in that: (1) the deposits were monetary transactions involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were originally derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(A), and 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. §§ 1956(c) and 1961(1); and (4) the transactions occurred in the United States.

**Tier Four Accounts**

### Bank of America Account No. 375012255329,
### Held by Ford Real Estate, LLC

155.   Records from BOA show that Account No. 375012255329 is a checking account held by Ford Real Estate, LLC.  The account was opened on May 30, 2013, and it has Nabil Fakih and Mona Fakih as its signatories.  As of February 28, 2019, the balance in the account was $32,752.00.

156.   Records from Chase Bank and BOA also show that from October 22, 2013, to February 12, 2014, with four interbank transactions, a total of $20,000.00 was moved from JPMC Account No. 510886380 to BOA Account No. 375012255329.

157.   JPMC Account No. 510886380 is presently closed and not sought for seizure. However, records from JPMC show that JPMC Account No. 510886380 was a checking account held by Ford Real Estate, LLC.  The account was opened on October 2, 2013, and it has Nabil Fakih and Mona Fakih as its signatories.  The account was closed in April 2014.

158.   Records from JPMC show that from October 2, 2013, to February 12, 2014, $44,000.00 was transferred from Tier Two Chase Bank Account No. 804759942 into JPMC Account No. 510886380.  Because of these transfers, JPMC Account No. 510886380 was a Tier Three account prior to its closure.

159.   Given the facts obtained during the investigation of this matter, and

set forth herein, there is probable cause to believe that at least $20,000.00 deposited into this account from Tier Three JPMC Account No. 510886380, were PBM reimbursements obtained through health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, respectively, and that any legitimate funds were commingled with illegitimate funds.

160.   In addition to being proceeds of the health care fraud scheme, there is probable cause to believe that all funds on deposit in this account were involved in concealing or disguising the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to seizure and forfeiture pursuant to 18 U.S.C.§§ 981(a)(1)(A) and 982(a)(1).

## CONCLUSION

161.   I am aware that Title 18 U.S.C. § 981(b)(3) authorizes the issuance of a seizure warrant in any district in which a forfeiture action against the property may be filed under 28 U.S.C. § 1355(b), and may be executed in any district in which the property is found.

162.   I am aware that Title 28 U.S.C. § 1355(b) authorizes the filing of a forfeiture action in the District Court for the district in which any of the action or omission giving rise to the forfeiture occurred.

163.    Given the magnitude and pervasiveness of the illegal activities involved in this scheme, and based upon the information contained in this Affidavit, there is probable cause to establish that the funds deposited in the following accounts constitute the proceeds and/or gross proceeds of Health Care Fraud, in violation of 18 U.S.C. § 1347, Conspiracy to Commit Health Care Fraud in violation of 18 U.S.C. § 1349, proceeds obtained, directly or indirectly, and/or used or intended to be used in any manner or part to commit, or to facilitate the commission of, and/or constitute property involved in, or are traceable to property involved in, Money Laundering, in violation of 18 U.S.C. § 1956 and or 18 U.S.C. § 1957.

164.    The funds are therefore subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 21 U.S.C. § 881(a), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and/or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

165.    Your affiant requests that for the following accounts, warrants be issued to seize, for purpose of civil and/or criminal forfeiture, all funds on deposit in the following accounts:

**A. Bank of America Account No. 4474000141, in the name of Dearborn Heights Pharmacy;**

**B. Bank of America Account No. 5407033538, in the name of NHF, Inc. DBA Dearborn Heights Pharmacy;**

C. Bank of America Account No. 5304840944, in the names of Nabil and Mona Fakih;

D. Bank of America Account No. 9097191127, in the names of Nabil and Mona Fakih;

E. Bank of America Account No. 375012255329, in the names of Ford Real Estate, LLC;

F. J.P. Morgan Chase Bank Account No. 975640616, in the name of Dial Drugs, Inc.;

G. J.P. Morgan Chase Bank Account No. 804759942, in the names of Nabil or Mona Fakih;

H. J.P. Morgan Chase Bank Account No. 2968539183, in the names of Wael Khanafer and Sarah Jafar;

I. J.P. Morgan Chase Bank Account No. 975640830, in the name of Infinity RX, PC;

J. J.P. Morgan Chase Bank Account No. 966198202, in the names of Wael Khanafer and Sarah Jafar;

K. J.P. Morgan Chase Bank Account No. 993627942, in the names of Nabil or Mona Fakih;

L. Merrill Lynch Account No. 642-18494, in the name of Nabil and Mona Fakih;

M. Merrill Lynch Account No. 642-29336, in the name of Nabil and Mona Fakih;

N. Merrill Lynch Account No. 51X-58Y31, in the names of Nabil and Mona Fakih.

O. AXA Life Insurance Policy No. 157213020, held By Nabil Fakih

**P.** Fidelity Investments Account No. **X91-704772**, in the name of **Nabil Fakih**

**Q.** Fidelity Investments Account No. **X66-970688**, in the name of **Nabil Fakih**

**R.** Fidelity Investments Account No. **X83-924263**, in the name of **Nabil Fakih**

**S.** Fidelity Investments Account No. **X93-653593**, in the name of **Nabil Fakih**

166.   Affiant requests that each financial institution at which the Subject Accounts are established be instructed to provide federal agents with the current account balance upon seizure, as follows:

**The financial institution upon which this seizure warrant has been served is instructed to provide federal agents authorized to seize the funds with the current balance in each account upon service of the seizure warrant and at the request of the federal agents authorized to seize the funds.**

167.   Affiant further requests that the Court warrant and authorize the FBI to effect seizure of the four listed Fidelity investment accounts Nos. **X93-653593, X83-924263, X66-970688,** and **X91-704772**; the three listed Merrill Lynch investment accounts Nos. **642-18494, 642-29336,** and **51X-59Y31;** and, **AXA Life Insurance Policy No. 157213020,** to be seized, at its own discretion by directing the financial institution at which the account is established to do any of the following without further order of the Court:

The FBI is authorized to effect the seizure of the contents of each account by, in its discretion, directing the financial institution at which the account is established to do any of the following without further order of the Court: (a)To freeze the contents of the account in place, and to refuse the withdrawal of any funds from the account by anyone other than the FBI, and, while any contents of the account are frozen in place, to accrue any interest, dividends, and any other amount credited to the account until the FBI directs that the contents of the account be finally liquidated; or (b) To liquidate some or all of the contents of the account at one or more times at the direction of the FBI, and upon any such liquidation of any contents to turn over the liquidated amount to the FBI.

168.    Affiant further requests that the Court warrant and authorize the FBI

to effect seizure of the accounts receiving Medicare, Medicaid, and Blue Cross

Blue Shield reimbursements (**Bank of America Account No. 4474000141,**

and **J.P. Morgan Chase Bank Account No. 975640616**) to be pooled for fourteen

days to allow for the collection of reimbursements obtained pursuant to the fraud

scheme set forth herein that have been processed but not paid, as follows:

**The financial institution upon which this seizure warrant has been served is further instructed to allow incoming funds but not allow funds to be withdrawn, transferred, wired, routed or otherwise disbursed by or to any persons (other than the federal agents authorized to seize the funds) for a period of fourteen (14) days from the issuance of the warrant. The financial institution upon which this seizure warrant has been served is instructed to disburse funds to federal agents and without further order of the court.**

## REQUEST FOR SEALING

169.    It is respectfully requested that this Court issue an order sealing, until

further order of the Court, all papers submitted in support of this application,

including the application and search warrant.  I believe that sealing this document

is necessary because the items and information to be seized are relevant to an

ongoing investigation into the criminal organizations, as not all of the targets of this investigation will be searched at this time. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Special Agent Andrew Crump
Federal Bureau of Investigation

Sworn to before me and signed in my presence
and/or by reliable electronic means.

The Honorable Anthony P. Patti
United States Magistrate Judge

Dated:___May 3, 2019_____

59

# ATTACHMENT A

- All funds on deposit in AXA Life Insurance Policy Number 157213020

**The financial institution upon which this seizure warrant has been served is instructed to provide federal agents authorized to seize the funds with the current balance in each account upon service of the seizure warrant and at the request of the federal agents authorized to seize the funds.**

**The FBI is authorized to effect the seizure of the contents of each account by, in its discretion, directing the financial institution at which the account is established to do any of the following without further order of the Court: (a)To freeze the contents of the account in place, and to refuse the withdrawal of any funds from the account by anyone other than the FBI, and, while any contents of the account are frozen in place, to accrue any interest, dividends, and any other amount credited to the account until the FBI directs that the contents of the account be finally liquidated; or (b) To liquidate some or all of the contents of the account at one or more times at the direction of the FBI, and upon any such liquidation of any contents to turn over the liquidated amount to the FBI.**

AUSA:   Shankar Ramamurthy          Telephone:  (313) 226-9562

AO 109 (Rev. 11/13)  Warrant to Seize Property Subject to Forfeiture   Special Agent:   Andrew Crump          Telephone:  (313) 670-5817

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | Case: 2:19-mc-50660 -1 |
| *(Briefly describe the property to be seized)* | ) | Judge: Murphy, Stephen J. |
| | ) | Filed: 05-03-2019 |
| All funds on deposit in AXA Life Insurance Policy | ) Case No. | IN RE:SEALED MATTER(SW)(MLW) |
| Number 157213020 as further described on Attachment A | ) | |
| | ) | |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the _____ Eastern _____ District of _____ Michigan _____ be seized as being subject to forfeiture to the United States of America.  The property is described as follows:

All funds on deposit in AXA Life Insurance Policy Number 157213020 as further described on Attachment A with permission to serve the warrant electronically followed by original service

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before ___May 16, 2019___
  *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to the presiding United States Magistrate Judge on duty _____ .
  *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
  ☐ for ____ days (not to exceed 30)   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   ___May 3, 2019   11:11 am___          _____
                                                                                                *Judge's signature*

City and state:   ___Detroit, MI___          Anthony P. Patti          U. S. Magistrate Judge
                                                                              *Printed name and title*

AO 109 (Rev. 11/13)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of:

Inventory of the property taken:

| Certification |
|---|

  I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*